UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

HANJIN SHIPPING CO LTD.,

                          Petitioner,

-v-

INTERNATIONAL OIL OVERSEAS INC.,

                          Respondent.
-------------------------------------------------------x

10 CIV

**VERIFIED PETITION TO
RECOGNIZE, CONFIRM,
AND ENFORCE FOREIGN
ARBITRAL AWARD**

Petitioner, HANJIN SHIPPING CO LTD. (hereinafter "HANJIN" or "Petitioner"), by and through its undersigned attorneys, CHALOS & CO, P.C., as and for its Verified Petition to Recognize, Confirm and Enforce a Foreign Arbitral Award rendered in favor of EMR and against Respondent, INTERNATIONAL OIL OVERSEAS INC. (hereinafter "INTERNATIONAL OIL" or "Respondent"), alleges upon information and belief as follows:

<u>JURISDICTION</u>

1.    Jurisdiction is conferred under this Court's Federal Question Jurisdiction pursuant to 28 U.S.C. § 1331, as the action arises under the enacting legislation for the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (hereinafter "the New York Convention"), codified at 9 U.S.C.§ 201 *et seq.* and the Federal Arbitration Act, codified at 9 U.S.C. § 1 *et seq.*

2.    In addition, this action is subject to this Court's admiralty jurisdiction, pursuant to 28 U.S.C. § 1333 and Fed. R. Civ. Proc. 9(h) because the underlying dispute is maritime in nature and concerns a breach of a maritime contract.

## THE PARTIES

3.      At all times material hereto, Petitioner HANJIN was and still is a foreign business entity, with a principal place of business in Korea.

4.      At all times material hereto, Respondent INTERNATIONAL OIL was and still is a foreign business entity with an address at P.O. Box 1086, Fujairah, United Arab Emirates.

5.      On or about January 8, 2009, INTERNATIONAL OIL registered to conduct business in New York with the New York Department of State and appointed a registered agent in the Southern District of New York, Michael E. Unger, c/o Freehill Hogan & Mahar, 80 Pine Street, New York, New York 10005.   In so doing, INTERNATIONAL OIL voluntarily submitted itself to the personal jurisdiction of the courts of New York.   A copy of the Department of State Registration for INTERNATIONAL OIL is annexed hereto as Exhibit "1".

## VENUE

6.      Venue is proper in this District pursuant to 9 U.S.C. § 204, in that, save for the arbitration agreement; an action or proceeding with respect to the controversy between the parties could have been brought in this District.

7.      Moreover, to the extent the Court asserts admiralty jurisdiction over this matter, venue is proper in accordance with Fed. R. Civ. Proc. 82.

8.      Furthermore, Respondent INTERNATIONAL OIL is "found" within this District as the Respondents have registered with the New York Department of State, Division of Corporations, and have designated an agent for process within the Southern District of New York.  Thus, venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b)(3).

## FACTS AND CLAIM

9.      On or about December 4, 2008, Petitioner HANJIN, as disponent owners of the vessel "SUN ROSE", and INTERNATIONAL OIL, as charterers, entered into a charter party agreement (evidenced by a fixture recap and based on an amended Asbatankvoy form with additional clauses) for a voyage from Fujairah to Singapore with a cargo of fuel oil.  A true copy of the charter party agreement is attached hereto as Exhibit "2".

10.      This charter party agreement is a maritime contract.

11.      The parties' arbitration agreement is contained in Clauses 24 and additional Clause 25 of the charter party agreement, which provided that any disputes between the parties should be referred to arbitration in London with English law to apply.

Clause 24 states:

Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration . . . in the City of London . . . before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen.  The decision of any two of the three on any point or points shall be final . . . .

Additional Clause 25 states:

General Average and Arbitration shall take place in London and English Law applies to this charter party.

12.      Pursuant to the terms of the charter party agreement, INTERNATIONAL OIL agreed, *inter alia*, to pay demurrage to HANJIN at the rate of USD 30,000.00 per day per rata.

13.      During the pendency of the charter party, disputes arose between the parties regarding commencement of laytime at the loadport.  HANJIN claimed demurrage in the sum of USD 268,835.93, plus interests and costs.  INTERNATIONAL OIL conceded demurrage in the sum of USD 24,253.15, but no more.

14.     In accordance with the parties' agreement, HANJIN commenced arbitration by appointing John Schofield to act as Owners' party-appointed arbitrator.     Thereafter, INTERNATIONAL OIL appointed Patrick O'Donovan to act as Charterers' party-appointed arbitrator.  No third arbitrator was appointed, with both sides agreeing that the party appointed arbitrators should proceed to an award.

15.     Upon consideration of the parties' respective written claim, defense and reply submissions and supporting documents, the arbitration Tribunal issued its Final Arbitration Award on October 11, 2010, in favor of Petitioner HANJIN.   A certified copy of the Final Arbitration Award is attached hereto as Exhibit "3".

16.     The  Final  Arbitration  Award  provides  under  its  terms  that  Respondent INTERNATIONAL OIL is ordered to pay damages and costs as follows:

 (a)  principal damages in the amount of  USD 268,835.93;

(b) interest on the said amount at the rate of 4% per annum compounded at three monthly rests from March 1, 2009, until the date of payment;

(c)  HANJIN's costs of the Final Arbitration Award, to be determined by the Tribunal if not agreed between the parties;

(d) interest on HANJIN's costs of the Final Arbitration Award at the rate of 4% per annum compounded at three monthly rests from October 11, 2010, until the date of payment;  and

(e) the arbitrators' costs for the Award: £ 4,750 (USD 7,567.99[1]), and provided that if HANJIN had paid any part of the arbitrators' costs of the First Final Arbitration Award, it is entitled to an immediate refund from the charterers of the sum paid along with interest thereon at the rate of 4% per annum compounded at three monthly rests from the date of payment until the date of reimbursement.[2]

*See* Exhibit "3" at pages 2, ¶¶ B-C of the Final Arbitration Award.

---

[1] £1.00 = US $7,567.99 as assessed at www.xe.com on November 17, 2010.
[2] Petitioner HANJIN paid the arbitrators' costs in full on October 15, 2010 and, accordingly, interest has continued to accrue from this date.

17.     The Tribunal issued the Final Arbitration Award as to the matters determined therein and reserved the power to make a further award (or awards) as may be appropriate in respect of any outstanding differences between the parties, including, *inter alia*, the costs in the arbitration reference.

18.     HANJIN has demanded from INTERNATIONAL OIL that they promptly remit the amounts due under the Final Arbitration Award.  Respondent INTERNATIONAL OIL, in bad faith, have refused, neglected, and/or otherwise failed to make any payment against the award.

19.     The Final Arbitration Award is final and enforceable.   In accordance with applicable English law, the time within which Respondent INTERNATIONAL OIL could have appealed the First Final Arbitration Award has now run.

20.     Both the United Kingdom and the United States are parties to the New York Convention, which states that a court sitting in any nation that is a party to the New York Convention must recognize and enforce a foreign arbitral award, where certified copies of both the agreement to arbitrate and the arbitral award are presented to the court, so long as the application for such is timely made and none of the delineated exceptions for non-recognition are present.

21.     This application to recognize and confirm the arbitral award is brought within two (2) months from the day the Arbitration Trinbunal issued same and, accordingly, the application for its confirmation is timely in accordance with 9 U.S.C. § 207.

22.     Respondent INTERNATIONAL OIL cannot in good faith raise any of the delineated reasons under the New York Convention, Article V, for non-recognition of the First Final Arbitration Award.

WHEREFORE, Petitioner HANJIN prays:

A.      That process in due form of law issue against the Respondent INTERNATIONAL OIL, citing Respondent to appear and answer under oath all, and singular, the matters alleged in the Verified Petition;

B.      That its foregoing Petition to Recognize, Confirm and Enforce the Foreign Arbitration Award be granted and the First Final Arbitration Award be recognized, confirmed, and made into a Judgment of this Court, to be entered in favor of Petitioner HANJIN SHIPPING CO LTD., and against Respondent INTERNATIONAL OIL OVERSEAS INC., and that this Court also adjudge Respondent liable to Petitioner for interest on the Award and Judgment;

C.      That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary for the purpose of enforcing the Judgment, and/or any further judgments which may be obtained;

D.      That this Court grant Petitioner its costs and expenses, including reasonable attorneys fees, in pursuing Judgment and Enforcement; and

E.      That Petitioner may have such other, further and different relief as may be just and proper.

Dated: Oyster Bay, New York
      November 17, 2010

                      CHALOS & CO, P.C.
                      Attorneys for Petitioner
                      HANJIN SHIPPING CO LTD.

By:    _Kerri M D'Ambrosio_
                      George M. Chalos (GC-8693)
                      Kerri M. D'Ambrosio (KD-0249)
                      123 South Street
                      Oyster Bay, New York 11771
                      Tel: (516) 714-4300
                      Fax: (516) 750-9051
                      E-mail: gmc@chaloslaw.com
                              kdambrosio@chaloslaw.com

# EXHIBIT 1

# NYS Department of State

## Division of Corporations

### Entity Information

The information contained in this database is current through November 16, 2010.

Selected Entity Name: INTERNATIONAL OIL OVERSEAS INC.
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | INTERNATIONAL OIL OVERSEAS INC. |
| **Initial DOS Filing Date:** | JANUARY 08, 2009 |
| **County:** | NEW YORK |
| **Jurisdiction:** | PANAMA |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

FREEHILL HOGAN & MAHAR, LLP
ATTN: MICHAEL E. UNGER
80 PINE STREET
NEW YORK, NEW YORK, 10005

**Registered Agent**

MICHAEL E. UNGER
C/O FREEHILL HOGAN & MAHAR
80 PINE STREET
NEW YORK, NEW YORK, 10005

This office does not record information regarding
the names and addresses of officers, shareholders or
directors of nonprofessional corporations except the
chief executive officer, if provided, which would be
listed above. Professional corporations must include
the name(s) and address(es) of the initial officers,
directors, and shareholders in the initial certificate
of incorporation, however this information is not
recorded and only available by viewing the
certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|

No Information Available

*Stock information is applicable to domestic business corporations.

**Name History**

| Filing Date | Name Type | Entity Name |
|---|---|---|
| JAN 08, 2009 | Actual | INTERNATIONAL OIL OVERSEAS INC. |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results                    New Search

Services/Programs   |   Privacy Policy   |   Accessibility Policy   |   Disclaimer   |   Return to DOS Homepage   |   Contact Us

EXHIBIT 2



We hereby certify that this is a true copy of the ~~Original~~ Document *submitted* to the Tribunal upon which the Award dated 11/10/10 is based. MFB

# Alliance Chartering Pte Ltd

### 11 Collyer Quay, #11-01 The Arcade, Singapore 049317
### Tel : (65) 6224-0123 / Fax : (65) 6224 5100 / E mail : allchart@alliancetanker.com

DATE: 5TH/DECEMBER/2008

TO  : INTERNATIONAL OIL OVERSEAS INC.
ATTN: SHEHARIEL BACKER

TO  : HANJIN SHIPPING
ATTN: MR.C.M. JEONG

TO  : KOEL INTERNATIONAL
ATTN: JOHNNY CHOI

WE ARE PLEASE TO RECAP THE FOLLOWING FIXTURE WITH ALL SUBJECTS FULLY LIFTED
AND WITH TERMS AND CONDITIONS ASF:

+++ STRICTLY P&C +++

------------------------------------------------------------------
                              (TITLE)

CHARTERER         : INTERNATIONAL OIL OVERSEAS INC.
OWNERS            : HANJIN SHIPPING CO., LTD. AS T/C OWNER
DISPONENT OWNERS  : N/A

BROKER            : ALLIANCE TANKER CHARTERING PTE LTD
CO-BROKER         : KOEL INTERNATIONAL, STH KOREA
CHARTER PARTY FORM: ASBATANKVOY
DATED             : 04/DECEMBER/2008

------------------------------------------------------------------
                             (VESSEL)

VESSEL          : SUN ROSE
EX-NAME         : MANDELO
BLT             : 31/MAR/1993
FLAG            : KOREA
CLASS           : KR
SDWT            : 95,621 METRIC TONNES
SDRAFT          : 13.467 METRES
LOA             : 246.86 METRES
BEAM            :  42.00 METRES
BCS             : 2 X 200 METRIC TONNES - TONGUE TYPE
CHAIN SIZE      : 78 MILLIMETRES DIAMETER
CUBIC 98 PCT    : 105018.83 CU. METRES (EXCL. SLOP)
TPC             : 90.00  METRIC TONNES (ON SUMMER DRAFT)
BCM             : 112.00 METRES
KTM             : 48.90  METRES
IGS             : YES
COW             : YES
SBT/CBT         : SBT

P1

```
VRS              : YES
GRT              : 52525  METRIC TONNES
NRT              : 28208  METRIC TONNES
CRANE            : 1 X 15 METRIC TONNES
COATED           : FULL COAT
HEATING          : STAINLESS STEEL COIL
HULL             : DOUBLE HULL
P&I CLUB         : STEAMSHIP MUTUAL
```

LAST 3 CARGOES   : FUEL OIL / QATAR MARINE CRUDE / JABEL DHANNA CRUDE

TBOOK            :  BP / BHP / PETRONAS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                         (CARGO)

```
CARGO QUANTITY   : MINIMUM 80,000.00 CHARTERERS OPTION UPTO FULL CARGO
GRADE(S)         : 1 - 2 GRADE(S) FUEL OIL / DPP
SEGREGATION      : MAX TWO GRADES WNS
HEAT             : VESSEL TO MAINTAIN LOADED TEMP BUT MAXIMUM 135
                   DEG F. MAXIMUM LOADING TEMP 165 DEG F
```

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                         (DATES)

LAYCAN           : 27TH DECEMBER 2008 (0001)
                   29TH DECEMBER 2008 (2359)

NOTE:   LAYCAN TO BE NARROWED TO 2 DAYS LAYCAN IN CHARTERER'S OPTION WHICH
        TO BE DECLARED BY 20/DEC/2008

ITINERARY        : ETA/D TANJUNG PELEPAS 8-9/DEC
                   ETA/D SPOR 10-11/DEC
                   ETA FUJA 21-22/DEC BSS AGW + WSNP

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                      (GEOGRAPHICAL)

LOADING RANGE    : 1-2/ SP/STS ARABIAN GULF - RAS TANURA - JUBAIL -
                   KUWAIT - FUJAIRAH RANGE EXCLUDING IRAN AND IRAQ

DISCHARGING RANGE : 1-3 SP/STS SINGAPORE - OPL SIN (PASIR GUDANG-TG PELEPAS-
                    KARIMUN RANGE) - MALAYSIA - THAILAND - CHINA - JAPAN
                    RANGE BUT EXCL. TOLO HARBOUR, NONOC ISLAND
                    AND CHINESE RIVER PORTS

- CHRTS TO DECLARE FINAL DISCHARGE PORT UPON COMPLETION LOADING

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                       (FINANCIAL)

FREIGHT RATE     : WORLD SCALE 144.00

OVERRAGE         : ZERO OVERRAGE

DEMURRAGE RATE          : USD 30,000.00 FDPR

-------------------------------------------------------------------------
                              (OTHER TERMS)

LAYTIME          : 84 HRS

OWNERS BANKING DETAILS:-

PAYMENT IN US DOLLARS BY TELEGRAPHIC TRANSFER TO:

         CITYBANK OF NEW YORK
         SWIFT CODE : SHBKKRSE
         ACCOUNT NO : 383-81-100283
         FOR CREDIT TO SHINHAN BANK
         YOIDO CHOONGANG BRANCH, SEOUL, KOREA
         IN FAVOUR OF HANJIN SHIPPING CO. LTD.

-------------------------------------------------------------------------
                         (TERMS/SPECIAL PROVISION)

- ISPS CLAUSE FOR VOYAGE CHARTER PARTIES TO APPLY
- ANY TAX AND OR DUES ON CARGO AND OR FREIGHT TO BE FOR CHARTS ACCOUNT
  AND TO BE SETTLED DIRECTLY BY THEM
- WSTC
- BIMCO ISPS CLAUSE TO APPLY
- GA/ARB LONDON, ENGLISH LAW TO APPLY
- CONOCO WEATHER CLAUSE TO APPLY EXCEPT DURING STS/LIGHTERING OPERATION WHEN
  FULL TIME TO COUNT WHEATHER PERMITTING OR NOT
- FREIGHT IS PAYABLE IN USD VIA T/T TO OWNERS DESIGNATED BANK ON COMPLETION
  OF DISCHARGE.


- VIETNAM CLAUSE
   1. HELICOPTER CHARGES IN VIETNAM TO BE FOR CHARTERERS ACCOUNT
      AND SETTLED DIRECTLY WITH THE AGENTS.
   2. AT VIETNAM IF VESSEL IS FOR ANY REASON INCLUDING BUT NOT LIMITED
      TO ADVERSE WEATHER, REQUIRED TO PROCEED AT THE REQUEST OF THE
      TERMINAL OR CHARTERERS, OUTSIDE THE RECOGNIZED ANCHORAGE OR
      WAITING AREA FOR THE PORT THEN SUCH DEVIATION TO BE REIMBURSED
      TO OWNERS AGAINST SUPPORTING DOCUMENTS AT DEMURRAGE RATE PLUS
      THE COST OF BUNKERS CONSUMED DURING SUCH DEVIATION AT LAST
      INVOICED PRICE.
   3. ANY DEVIATION INCURRED WHILST IN VIETNAM TO PICKUP OR DROP OFF
      SHORE PERSONNEL IF ORDERED BY THE PORT OR TERMINAL TO BE FOR
      CHARTERERS ACCOUNT TOGETHER WITH BUNKERS CONSUMED.


- OWNERS STS CLS:

IF VESSEL PERFORMS STS/LIGHTERING OPERATIONS AT ANY PORT(S), CHARTERER WILL
PROVIDE LIGHTERAGE VESSEL, FENDERS, HOSES, FOR THE PERFORMANCE OF THE SHIP-
TO-SHIP TRANSFER AND ALL OTHER EQUIPMENT NECESSARY FOR A SAFE OPERATION IN
ACCORDANCE WITH OCIMF SHIP-TO-SHIP TRANSFER GUIDE(PETROLEUM). IN
ADDITION,ANY COSTS FOR STS OPERATION, INCLUDING BUT NOT LIMITED TO PORT
COSTS,STANBY TUGS AND AGENCY FEES TO BE FOR CHARTERERS' ACCOUNT AND TO BE

SETTLED DIRECTLY BY THEM. TIME CONSUMED FROM TIME UPON THE EXPIRATION OF 6 HOURS AFTER RECEIPT OF NOTICE OF READINESS OR UPON VESSEL'S ALONGSIDE AT THE LIGHTERING STATION WHICHEVER OCCURS FIRST    UNTIL CARGO HOSES ARE DISCONNECTED OR TDAUGHTER VESSEL CAST OFF STS EQUIPMENTS AND FENDERS REDELIVERED WHICHEVER LATER OCCURS SHALL COUNT AS USED LAYTIME OR TIME ON DEMURRAGE IF ON DEMURRAGE. IF STS / SBM / LIGHTERING /LIGHTENING /OPEN SEA BERTH/SEA LINE/SEA BUOY, TIME TO COUNT IN FULL WEATHER PERMITTING OR NOT. ANY UNBERTHING/REBERTHING DUE TO WEATHER A/O SEA CONDITIONS, TO BE AT CHTRS TIME AND EXPENSE.

- CANCELLATION CLAUSE

SHOULD IT BECOME APPARENT TO THE OWNERS THAT THE VESSEL WILL MISS HER CANCELLING DATE, THE OWNERS WILL PROPOSE A NEW 2 DAY LAYCAN TO THE CHARTERERS. CHARTERERS TO CONFIRM WITHIN TWO (2) WORKING DAYS IF THEY AGREE THE NEW LAYCAN OR CANCEL THE CHARTER. IF CHARTERERS DO NOT RESPOND TO THE PROPOSED NEW LAYCAN WITHIN TWO WORKING DAYS THEN THE PROPOSED NEW LAYCAN SHALL BE DEEMED TO BE ACCEPTED BY THE CHARTERERS.

- MAX 3 HOURS WAITING FOR CARGO DOCS FOR OWNERS ACCT

- IF MORE THAN ONE SAFE BERTH OR SAFE ANCHORAGE OR OTHER SAFE STS OPERATION LOCATION TO BE USED AT LOADING OR DISCH PORT, ALL ADDITIONAL PORT COSTS DUE TO SUCH OPERATION, INCLUDING BUT NOT LIMITED TO : SHIFTING TIME/EXPENSE, ETC., TO BE FOR CHTRS ACCOUNT,

- MASTER TO DISCHARGE ANY CARGO FROM THE VESSEL ONLY UPON RECEIVING CHARTERERS WRITTEN AUTHORIZATION AS PER FORM BELOW: -
  ++++          ++++              +++++
  To    : Master ....  And or Warehouse ....

  "We confirm that you are hereby authorized to berth and discharge approximately...... mts of ..... as per the charter party terms and conditions and any subsequent delivery instructions dated subsequent to this message."

ASBATANKVOY
PART II
----------
Clause 4C   Delete "count as used laytime" insert "paid at demurrage rate".
Clause 7    Delete "or port authorities". In last line after "slops" insert
            "unless carried out concurrently with cargo operations".
Clause 11   In second line add "If vessel is delayed by more than 3 hours
            awaiting documents,laytime or demurrage,if vessel is on
            demurrage, shall count until documents is onboard".
Clause 17A  Delete from "but should the" and balance of sentence.
Clause 18   Delete "the charterer's" insert "an independen inspector if
            appointed by Chrts for Chrts account"

INTERNATIONAL OIL OVERSEAS INC (ADDITIONAL CLAUSES FOR ASBATANKVOY) DATED 07.08.2003(1-43) WITH FOLLOWING AMMEDMENTS:

   3.  ETA CLAUSE
       DELETE all ETA notices are essential for demurrage purposes
       AFTER " arrival" INSERT " if time allows"

4.   CARGO CLAUSE
     DELETE 1ST PARA
     4TH PARA:
     DELETE of heating to and
     AFTER at INSERT cargo loaded temp but max
     DELETE as per charterers instructions. Due allowance in time only is
     to be made for cargo heating for a voyage of less than three days.
     AFTER carriage of INSERT the agreed cargo

5.   PUMPING
     AFTER manifolds DELETE a INSERT an average
     DELETE 140 INSERT 100
     DELETE and
     AFTER 24 hours INSERT in both cases excluding stripping
     DELETE 2ND PARA

     PARA 4 LINE 2 DELETE 'IN CLAUSE 18 (f)(ii)' AND INSERT "AS ABOVE"

     IN LAST PARA, LINE 2, AFTER 'EFFECT' INSERT 'IF POSSIBLE'
                  LINE 4, DELETE 'AND' INSERT 'OR'

6.   SHIP TO SHIP TRANSFER OPERATION
     LINE 1 DELETE and
     LINE 2 AFTER anchorage INSERT always as per ocimf rules and
     regulations
     DELETE Concurrent loading or discharging from both
     side for cargo with flash point over 60 degrees centigrade
     shall be acceptable by owners, any restriction for such will
     not count as laytime used.
     PARA 2 LINE 1  AFTER hoses INSERT etc as per OCIMF rules and
                    regulations
            LINE 1  DELETE and have the option to store same on
                    board for the duration of charter party.
                    Handling of such equipment on board the
                    vessel shall be by owners' crew at owners'
                    cost
            LINE 4 DELETE charterparty INSERT loading or discharging

     PARA 3 DELETE
     PARA 4 LINE 1 DELETE "DERRICKS" insert "crane"
            LINE 1 DELETE 'AND' INSERT 'OR'

     PARA 5 DELETE and insert "Charterers have no liability for hull or
     other damage, if any, that may occur during such operations due to
     Masters/owners fault"
     "LAYTIME AT STS OPERATION - ALL TIME CONSUMED FROM 6 HOURS AFTER
     VESSEL ARRIVAL AND TENDER NOR AT STS POINT OR VESSEL BEING ALONGSIDE
     WHICHEVER EARLIER, UNTIL VESSEL CASTS OFF AND COMPLETE UNFENDERING,
     SHALL COUNT AS USED LAYTIME."

7.   SUPER CARGO
     LINE 1 DELETE at any time AFTER during INSERT load or discharge of
     LINE 2 AFTER "with" DELETE "good" INSERT "suitable"
     LINE 2 DELETE " private bath " AND "at captain table"
     LINE 4 DELETE slop, bunker and ballast tanks
     LINE 5 AFTER 'void space' INSERT ' at his own risk but always with

Master consent '

LINES 5-6 DELETE and access to any other parts of vessel that may
relate to carriage of cargo as he may require

9.  PROTECTION & INDEMNITY CLASUE
    INSERT - STEAMSHIP MUTUAL
    DELETE US$500 million and additional US$200 million INSERT US$ 1
    billion
    DELETE Owners agreed to allow charterers to have
    the benefit of owners' P&I insurance to the extent the Rules of that
    Association permits.

10. INSURED VALUE
    INSERT 'USD 52.0 MILLION'

11. COMMUNICATION
    AFTER equipment INSERT except mobile and satellite phones.

12. TRADING HISTORY
    DELETE "guarantee" and insert "to the best of owners knowledge"

13. AGENCY
    ADD "provided competitive" INSERT ' if Malaysian Port to be Owner's
    agent '

15. OVER AGE INSURANCE - DELETE

17. BERTH OCCUPANCY
    DELETE first sentence.
    LINE 3 delete "after such time "and insert "soon as
    possible"

    LINE 3, AFTER 'ATTRIBUTED' INSERT 'SOLELY'
    ADD AT END However if vessel is waiting for cargo documents then such
    time and extra costs as above to be for Charterers account.

18. CHARTER SIGNATURE
    delete "payment procedures"
    AFTER signed INSERT by Owners or their Agents

19. INTRANSIT LOSS - DELETE ALL AND REPLACE WITH THE FOLLOWINGS

    VSL IS TO BE ALLOWED MAX 0.5% OF IN TRANSIT LOSS WHICH SHALL BE
    THE DIFFERENCE BETWEN THE GROSS QUANTITY MEASURED ONBOARD VSL
    AFTER LOADING AND GROSS QUANTITY MEASURED ONBOARD PRIOR TO
    DISCHARGE, LESS ANY OR ALL FREE WATER ONBOARD PRIOR TO LOADING.
    ANY LOSS EXCEEDING THE SAID 0.5% IS TO BE REIMBURSED BY OWNER
    TO CHARTERER AT AN AMOUNT EQUOAL TO THE FOB PORT OF LOADING
    VALUE OF SUCH CARGO PLUS FREIGHT AND INSURANCE DUE WITH RESPECT
    THERETO.

20. CARGO RETENTION - DELETE

21. BLENDING - DELETE

22. DEMMURAGE TIME BAR

P6

delete all references to "original"
LINE 2 DELETE FROM telex invoice UPTO AND INCLUDING followed by the
LINE 3 DELETE to be INSERT is
LINE 3 DELETE fully certified
LINE 5 DELETE and accepted
LINE 5 AFTER countersigned INSERT if possible
LINE 7 AFTER representative INSERT if possible

23. ADHERENCE TO VOYAGE INSTRUCTIONS
LINE 1 AFTER instructions INSERT provided in accordance with this c/p

24. YORK / ANTWERP RULE - DELETE 1990 INSERT 1994

26. BILL OF LADING
LINE 1 AFTER port INSERT and/or consignee
AFTER if the INSERT duly endorsed original

27. ROB'S
DELETE deduct from freight INSERT claim
ADD: provided the volume of cargo remaining on board is pumpable,
liquid and reachable by vessel's fixed pumps as determined by and
independent surveyor.

28. WAR RISKS
DELETE - INSERT:

BP WAR RISK INSURANCE CLAUSE (AMENDED) -
------------------------------
OWNERS SHALL EFFECT WAR RISKS INSURANCE IN RESPECT OF THE HULL AND
MACHINERY OF THE VESSEL AND THEIR OTHER INTERESTS (INCL BUT NOT
LIMITED TO, LOSS OF EARNINGS AND DETENTION AND THEIR PROTECTION AND
INDEMNITY RISKS), AND THE BASIC PREMIUMS AND/OR CALLS THEREFORE SHALL
BE FOR OWNERS ACCOUNT. WAR RISKS INSURANCE= ADDITIONAL PREMIUMS IF ANY
ARE FOR CHARTERERS ACCOUNT, NET OF ALL DISCOUNTS OR REBATES RECEIVED
BY OWNERS, AND PROVIDED ALWAYS THAT CHARTERERS ARE GIVEN AN INDICATION
OF THE EXPECTED AMOUNT OF ADDITIONAL PREMIUM AS SOON AS POSSIBLE AFTER
RECEIPT OF CHARTERERS VOYAGE ORDERS.

THE BENEFIT OF DISCOUNTS OR REBATES ON ADDITIONAL PREMIUM RECEIVED BY
OWNERS FROM THEIR WAR RISKS INSURERS, UNDERWRITERS OR BROKERS SHALL BE
CREDITED TO CHARTERERS IN FULL. CHARTERERS SHALL REIMBURSE OWNERS ANY
AMOUNTS DUE UNDER THIS CLAUSE UPON RECEIPT OF OWNERS' INVOICE TOGETHER
WITH REASONABLE SUPPORTING  DOCUMENTATION INCLUDING ALL ASSOCIATED
DEBIT AND CREDIT NOTES (IF ANY).=

FOR THE AVOIDANCE OF DOUBT ANY 'BLOCKING AND TRAPPING', 'LOSS OF
PROFIT','LOSS OF HIRE''LOSS OF FREIGHT' OR 'LOSS OF BUNKERS' INSURANCE
TAKE OUT BY OWNERS IN RESPECT OF THE VESSEL, AND ANY ADDITIONAL
PREMIUM RELATING THERETO  ARISING FROM CHARTERERS TRADING OF THE
VESSEL SHALL BE FOR OWNERS' ACCOUNT.CREW  WAR BONUS TO BE FOR OWNERS
ACCOUNT.

30. PRORATION - DELETE

31. NAMING LOAD AND DISCHARGE PORTS - DELETE

32. POSITION AND BALLAST SPEED - DELETE AS PER VSL'S FULL ITINERARY

33. SPEED - DELETE ALL AND INSERT vessel will perform laden passage at about 13.5 knots WSNP

34. BALLASTING / SHIFTING
    AFTER de-ballasting INSERT unless concurrent with cargo operations
    AFTER proceeding to INSERT first BERTH

35. DOCUMENTATION
    AFTER representative INSERT or port authorities

36. DELETE

37. DELETE N/A

38. ADD AT THE END: on their request.

39. PARAGRAPH 2 LINE 2 AFTER out of INSERT previous

40. DISCHARGE / RELOADING CLAUSE - DELETE

41. BUNKER SUPPLY CLAUSE - DELETE

42. FUEL OIL CLAUSE
    3RD PARA, LINE 3, DELETE 'OR INDIRECTLY'

43. CURRENCY CLAUSE - DELETE


+ END RECAP +

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                         (COMMISSION)

2.50 PCT ADDRESS COMMISSION TO CHARTERERS ON
     FREIGHT/DEADFREIGHT/DEMURRAGE IF ANY

1.25 PCT BROKERAGE COMMISSION TO ALLIANCE TANKER CHARTERING PTE LTD ON
     FREIGHT/DEADFREIGHT/DEMURRAGE IF ANY

1.25 PCT BROKERAGE COMMISSION TO KDEL INTERNATIONAL. STH KOREA ON
     FREIGHT/DEADFREIGHT/DEMURRAGE IF ANY
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Many Thanks for your Support

BEST REGARDS
ATC/ADNAN M.NOOR

CODE WORD FOR THIS
CHARTY PARTY:
ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

Place                          Date

IT IS THIS DAY AGREED between       HANJIN SHIPPING CO., LTD, AS T/C OWNER

chartered owner/owner (hereinafter called the "Owner") of the

SS/MS     SUN ROSE                                          (hereinafter called the "Vessel")

and    INTERNATIONAL OIL OVERSEAS INC.                     (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this

Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

## PART I

A.   Description and Position of Vessel:

Deadweight: 95,621        tons (2,240 lbs.)     Classed:

Loaded draft of Vessel on assigned summer freeboard         ft.     in. in salt water.

                                                    tons (2,240 lbs. each)      % more or less, Vessel's option.

Capacity for cargo:

Coated:        [X] Yes   [ ] No

Coiled:        [X] Yes   [ ] No        Last two cargoes:

Now:                                   Expected Ready:

B.   Laydays:

          Commencing.        27TH DECEMBER 2008 (0001HRS)   Cancelling : 29TH DECEMBER 2008 (2359HRS)

C.   Loading Port(s).   1-2/ SP/STS ARABIAN GULF – RAS TANURA – JUBAIL - KUWAIT - FUJAIRAH RANGE
     EXCLUDING IRAN AND IRAQ                                               Charterer's Option

D.   Discharging Port(s)/ 1-3 SP/STS SINGAPORE – OPL SIN (PASIR GUDANG–TG PELEPAS– KARIMUN RANGE) –
     MALAYSIA – THAILAND – CHINA – JAPAN RANGE BUT EXCL. TOLO HARBOUR, NONOC ISLAND AND CHINESE
     RIVER PORTS
                                                                          Charterer's Option

E.   Cargo:  MINIMUM 80,000.00 CHARTERERS OPTION UPTO FULL CARGO 1 – 2 GRADE(S) FUEL OIL / DPP
     MAX TWO GRADES WVNS VESSEL TO MAINTAIN LOADED TEMP BUT MAXIMUM 135 DEG F. MAXIMUM
     LOADING TEMP 165 DEG F
                                                                          Charterer's Option

F.   Freight Rate:  WORLD SCALE 144.00

G.   Freight Payable to:  HANJIN SHIPPING CO., LTD.

al                                      P9

CITYBANK OF NEW YORK
SWIFT CODE : SHBKKRSE
ACCOUNT NO : 383-81-100283
FOR CREDIT TO SHINHAN BANK
YOIDO CHOONGANG BRANCH, SEOUL, KOREA
IN FAVOUR OF HANJIN SHIPPING CO. LTD,

H.   Total Laytime in Running Hours:  84 HRS

I    Demurrage per day:  USD 30,000.00 PDPR

J.   Commission of       % is payable by Owner to
     on the actual amount of freight, when and as freight is paid.

K.   The place of General Average and arbitration proceedings to be London/New York (strike out one).

L.   Tovalop:  Owner warrants vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this
     charter

M.   Special Provisions  :

- ISPS CLAUSE FOR VOYAGE CHARTER PARTIES TO APPLY
- ANY TAX AND OR DUES ON CARGO AND OR FREIGHT TO BE FOR CHARTS ACCOUNT
  AND TO BE SETTLED DIRECTLY BY THEM
- WSTC
- BIMCO ISPS CLAUSE TO APPLY
- GA/ARB LONDON, ENGLISH LAW TO APPLY
- CONOCO WEATHER CLAUSE TO APPLY EXCEPT DURING STS/LIGHTERING OPERATION WHEN
  FULL TIME TO COUNT WHEATHER PERMITTING OR NOT
- FREIGHT IS PAYABLE IN USD VIA T/T TO OWNERS DESIGNATED BANK ON COMPLETION
  OF DISCHARGE.


- VIETNAM CLAUSE
  1. HELICOPTER CHARGES IN VIETNAM TO BE FOR CHARTERERS ACCOUNT
     AND SETTLED DIRECTLY WITH THE AGENTS.
  2. AT VIETNAM IF VESSEL IS FOR ANY REASON INCLUDING BUT NOT LIMITED
     TO ADVERSE WEATHER, REQUIRED TO PROCEED AT THE REQUEST OF THE
     TERMINAL OR CHARTERERS, OUTSIDE THE RECOGNIZED ANCHORAGE OR
     WAITING AREA FOR THE PORT THEN SUCH DEVIATION TO BE REIMBURSED
     TO OWNERS AGAINST SUPPORTING DOCUMENTS AT DEMURRAGE RATE PLUS
     THE COST OF BUNKERS CONSUMED DURING SUCH DEVIATION AT LAST
     INVOICED PRICE.
  3. ANY DEVIATION INCURRED WHILST IN VIETNAM TO PICKUP OR DROP OFF
     SHORE PERSONNEL IF ORDERED BY THE PORT OR TERMINAL TO BE FOR
     CHARTERERS ACCOUNT TOGETHER WITH BUNKERS CONSUMED.


- OWNERS STS CLS:

IF VESSEL PERFORMS STS/LIGHTERING OPERATIONS AT ANY PORT(S), CHARTERER WILL PROVIDE
LIGHTERAGE VESSEL, FENDERS, HOSES, FOR THE PERFORMANCE OF THE SHIP-TO-SHIP TRANSFER AND ALL
OTHER EQUIPMENT NECESSARY FOR A SAFE OPERATION IN ACCORDANCE WITH OCIMF SHIP-TO-SHIP
TRANSFER GUIDE(PETROLEUM). IN ADDITION,ANY COSTS FOR STS OPERATION, INCLUDING BUT NOT
LIMITED TO PORT COSTS,STANBY TUGS AND AGENCY FEES TO BE FOR CHARTERERS' ACCOUNT AND TO BE
SETTLED DIRECTLY BY THEM. TIME CONSUMED FROM TIME UPON THE EXPIRATION OF 6 HOURS AFTER
RECEIPT OF NOTICE OF READINESS OR UPON VESSEL'S ALONGSIDE AT THE LIGHTERING STATION
WHICHEVER OCCURS FIRST  UNTIL CARGO HOSES ARE DISCONNECTED OR TDAUGHTER VESSEL CAST OFF
STS EQUIPMENTS AND FENDERS REDELIVERED WHICHEVER LATER OCCURS SHALL COUNT AS USED
LAYTIME OR TIME ON DEMURRAGE IF ON DEMURRAGE. IF STS / SBM / LIGHTERING /LIGHTENING /OPEN SEA
BERTH/SEA LINE/SEA BUOY, TIME TO COUNT IN FULL WEATHER PERMITTING OR NOT. ANY
UNBERTHING/REBERTHING DUE TO WEATHER A/O SEA CONDITIONS, TO BE AT CHTRS TIME AND EXPENSE.

- CANCELLATION CLAUSE

SHOULD IT BECOME APPARENT TO THE OWNERS THAT THE VESSEL WILL MISS HER CANCELLING DATE,
THE OWNERS WILL PROPOSE A NEW 2 DAY LAYCAN TO THE  CHARTERERS. CHARTERERS TO CONFIRM

P10

WITHIN TWO (2) WORKING DAYS IF THEY AGREE THE NEW LAYCAN OR CANCEL THE CHARTER. IF
CHARTERERS DO NOT RESPOND TO THE PROPOSED NEW LAYCAN WITHIN TWO WORKING DAYS THEN THE
PROPOSED NEW LAYCAN SHALL BE DEEMED TO BE ACCEPTED BY THE CHARTERERS.

- MAX 3 HOURS WAITING FOR CARGO DOCS FOR OWNERS ACCT

- IF MORE THAN ONE SAFE BERTH OR SAFE ANCHORAGE OR OTHER SAFE STS OPERATION
  LOCATION TO BE USED AT LOADING OR DISCH PORT, ALL ADDITIONAL PORT COSTS
  DUE TO SUCH OPERATION, INCLUDING BUT NOT LIMITED TO : SHIFTING
  TIME/EXPENSE, ETC., TO BE FOR CHTRS ACCOUNT,

- MASTER TO DISCHARGE ANY CARGO FROM THE VESSEL ONLY UPON RECEIVING
  CHARTERERS WRITTEN AUTHORIZATION AS PER FORM BELOW: -
  +++++        ++++        +++++
  To    : Master .... And or Warehouse ....

  "We confirm that you are hereby authorized to berth and discharge
  approximately...... mts of ..... as per the charter party terms and
  conditions and any subsequent delivery instructions dated subsequent
  to this message."

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in
duplicate as of the day and year first above written.

| | OWNER |
|---|---|
| | ............... .. ............................... |
| Witness to signature of: | |
| | By: ............................................... |
| | CHARTERER |
| | .................................................... |
| Witness to signature of. | |
| | By: ................. .......................... |

- 2 -

## PART II

1.  WARRANTY – VOYAGE - CARGO. The vessel classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to the Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for this voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat) from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperature requested.

2.  FREIGHT.    Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3.  DEADFREIGHT.    Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy conditions. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4.  NAMING LOADING AND DISCHARGE PORTS.
    (a)  The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

    |  | On a voyage to a port or ports in: |
    |---|---|
    | ST.KITTS | Carribbean or U.S. Gulf of loading port(s) |
    | PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
    |  | (from ports west of Port Said.) |

    (b)  If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharge port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

    | Place | On a voyage to a port or ports in: |
    |---|---|
    | LAND'S END United Kingdom/Continent (Bordeaux/Hamburg range) |  |
    |  | Of Scandinavia (including Denmark) |
    | SUEZ | Mediterranean (from Persian Gulf) |
    | GIBRALTER Mediterranean (from Western Hemisphere). |  |

    (c)  Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime paid at demurrage rate.

5.  LAYDAYS.   Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4.00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6.  NOTICE OF READINESS.  Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, any laytime, as hereinafter provided, shall commence upon expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival at berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharge alongside a wharf), whichever first occurs. Where, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7.  HOURS FOR LOADING AND DISCHARGING.  The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo, but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime, if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth; discharging ballast water or slops unless carried out concurrently with cargo operations, will not count as used laytime.

P12

8.  DEMURRAGE.  Charterer shall pay demurrage per running hour and pro-rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified.  If however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labour or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper, or consignee of the cargo, the rate of demurrage shall be reduced to one-half of the amount stated in Part I per running hour or pro-rata for part of an hour for demurrage so incurred.  The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labour for Master, officers and crew of the Vessel or tugboat or pilots.

9.  SAFE BERTHING, SHIFTING.  The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth.  Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10.  PUMPING IN AND OUT.  The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee.  If required by Charterer, Vessel after discharging is to clear shore pipelines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime.  The vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands.  However, should the vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes.  If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into the Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board.  All overtime of officers and crew incurred in loading and/or discharging shall be for account of Charterer.

11.  HOSES : MOORING AT SEA TERMINALS.  Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense.  Laytime shall continue until the hoses have been disconnected. When vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading and discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses. If vessel is delayed by more than 3 hours awaiting documents, laytime, or demurrage, if vessel is on demurrage, shall count until document is onboard.

12.  DUES-TAXES-WHARFAGE.  The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime.  The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the vessel or freight.  The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits and Spanish derramas taxes. The vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc., before, during or after loading or discharging.

13.  (a).  CARGOES EXCLUDED VAPOR PRESSURE.  Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100°F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.
(b).  FLASH POINT.  Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115°F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14.  (a).  ICE.  In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgement, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk.  The whole of the time occupied from the time the vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.
(b).  If on account of ice the Master considers it dangerous to enter or remain in any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15.  TWO OR MORE PORTS COUNTING AS ONE.  To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a).   Charterer shall pay freight at the highest rate payable under Part 1 F hereof for a voyage between the loading and discharge ports used by Charterer.

(b).   All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c).   Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(d).   Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16.   GENERAL CARGO.   The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17.   (a).   QUARANTINE.   Should the Charterer send the vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b).   FUMIGATION.   If the vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18.   CLEANING.   The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's an independent inspector if appointed by Charterers for the Charterers account. The Vessel shall not be responsible for any admixture of more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19.   GENERAL EXCEPTIONS CLAUSE.   The vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:- any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel, fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property, wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery, unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner.   And neither the Vessel nor Master or Owner, nor the Charterer, shall unless otherwise in this Charter expressly provided be responsible for any loss or damage or delay or failure in performing hereunder, arising or resulting from:- Act of God, act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo, strike or lockout or stoppage or restraint of labour from whatever cause, either partial or general; or riot or civil commotion.

20.   INSUANCE AND TERMS OF BILLS OF LADING

(a)   The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter.  The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b).   The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading.  In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i)   CLAUSE PARAMOUNT.  This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation.  The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act.  If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to that extent but no further.

(ii)   JASON CLAUSE.  In the event of accident, danger, damage, or disaster before or after commencement of the voyage resulting from any clause whatsoever, whether due to negligence or not, for which or for the consequence of which the Owner is not responsible by statute, contract, or otherwise, the cargo shippers, consignees, or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo.  If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the salving ship or ships belong to strangers.  Such deposit as the Owner or his agent may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii)   GENERAL AVERAGE.  General average shall be adjusted, stated and settled, according to York-Antwerp Rules 1950, and as to matters not provided for by the Rules, according to the laws and usages at the port of New York or at the port of London whichever place is specified in Part I of this Charter.  If a General Average statement is required, it shall be prepared

P14

at such port or place in the United States or United Kingdom, whichever place is specified in Part 1 of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterers. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv)  BOTH TO BLAME.   If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

(v)  LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi)  WAR RISKS.  (a)  If any port of loading or discharge named in this Charter Party or to which the vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or
(b)   If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibit or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge – the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Owners's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contracts of affreightment so far as cargo so discharged is concerned.  In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated.  In the event, however, that the Vessel discharge the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.
(c)   The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, port of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations.  If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo.  Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterer and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.
(vii)  DEVIATION CLAUSE.  The vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21.    LIEN.  The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22.    AGENTS.  The Owners shall appoint Vessel's agents at all ports.

23.    BREACH.  Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24.   ARBITRATION   Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen   The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city abovementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25   SUBLET.   Charterer shall have the right to sublet the Vessel.  However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26.   OIL POLLUTION CLAUSE.   Owners agrees to participate in Charterer's program covering oil pollution avoidance  Such program prohibits discharge overboard of all oily water, only ballast or oil in any form of a persistence nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.
Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment after separation of all possible water has taken place. All water separated to be discharged overboard.
If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.
Should it be determined that the residue is to be co-mingled or segregated on board, the Master shall arrange that the quantity of tank washings be measured in conjunction with cargo suppliers and a note of the quantity measured made in the vessel's ullage record.
The Charterers agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

## BILL OF LADING

Shipped in apparent good order and condition by _____
on board the _____ Motorship/Steamship_____
whereof _____ is the Master, at the port of _____

to be delivered at the port of _____
or so near thereto as the Vessel can safely get, always afloat, unto _____
or order on payment of freight at the rate of _____
This shipment is carried under the pursuant to the terms of the Charter dated  New York/London _____
between _____ and _____ as Charterer, and all terms whatsoever of the said Charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.
In witness whereof, the Master has signed _____ Bills of Lading of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____ day of _____

_____
Master

INTERNATIONAL OIL OVERSEAS
ADDITIONAL CLAUSES - (ASBATANKVOY)
DATED 07.08.2003   (1-43)

1) PRIVACY:

All negotiations and every detail of this fixture are to be kept strictly private and confidential.

2) DRUG AND ALCOHOL CLAUSE:
Owners warrant that they have a policy on Drug and Alcohol Abuse ("Policy") applicable to the vessel which meets or exceeds the standards in the Oil Companies' International Marine Forum Guidelines for the Control of Drugs and Alcohol on Board Ship ("OCIMF Guidelines").  Owners further warrant that this Policy will remain in effect during the            term of this Charter, and that Owners shall exercise due diligence to ensure that the Policy is complied with. For the purposes of the Clause and the OCIMF Guidelines, alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall be all vessel officers and the drug/alcohol testing and screening shall include random testing of the officers with a frequency to ensure that each officer is tested at least once a year.

    wners further warrant that a full declaration has been passed on to  Exxon/Exxon affiliate, which as above states that vessel operates under a Drug and Alcohol Policy which meets or exceeds the OCIMF Guidelines.

3) ETA CLAUSE:

Master to give  Charterers ETA loading port  immediately on  fixing and 7 days, 72/48/24/12 hours prior arrival **if time allows** at loading and discharge ports where  time  permits also ETA discharge port on sailing from load port  as  well as any change in ETA exceeding 6 hours in all cases. ~~All Eta notices are essential for demurrage purposes.~~

4)  CARGO:

~~Charterers have  the  option  of  loading  Crude  Oil, Dirty Petroleum Products, Gasoil and Marine Diesel Oil, maximum .....grades, but where vessel loads one grade on top  of  another for admixing purposes same to be treated as one grade.~~

    Owners warrant vessel  is  able to segregate minimum two (2) grades with double valve, line  and pump  segregation.

Owner warrants vessel able to  load/discharge two   (2) grades simultaneously without contamination.

The vessel is capable ~~of heating to and~~ maintaining cargo at **cargo max temperature but max** 135 degrees Fahrenheit prior to  discharge ~~as per Charterers instructions.  Due allowance in time only is to be made for cargo heating for a voyage of less than three days.~~
The vessel is to present at loading port(s)  fit for the carriage of the agreed cargo.

5) PUMPING:
Owners warrant  that  the  vessel can  maintain  at vessels manifolds **a an average** pressure of ~~140~~ 100 PSI and/or that a full cargo can be discharged within twenty four (24) hours **in both cases excluding stripping**, provided shore facilities permit.
~~Owner  warrants  vessel can discharge two (2) grades simultaneously.~~
~~In ship-to-ship transfer operations,  vessel  warrants to achieve a discharge rate of up to 2,500 metric tons per hour.~~

Vessel to have on board a sufficient range of reducers to allow connection to various hose line diameters and terminal cargo manifolds. Charterers shall be allowed deductions from pumping time as follows:

All time lost as a result of Vessel being unable to meet either the 24-hour pumping warranty or the Average Manifold Pressure warranty in Clause 18 (f)(ii) **as above** shall not count as laytime or, if Vessel is on demurrage, as time on demurrage.

If the discharging Port/Terminal does not allow or permit vessel to meet the above warranty, the Vessel's master shall obtain a written confirmation from the Port/Terminal to such effect if possible and shall forthwith issue a letter of Protest to such Port/Terminal and immediately advise Charterer by fax and email. If the Master fails to issue a Letter of Protest and **or** advise Charterer as aforesaid, Owner shall be deemed to have waived any rights to contest that time was lost as a result of Vessel's failure to comply with the above pumping warranty.

6) SHIP TO SHIP TRANSFER OPERATIONS:
If required by the Charterers the vessel shall load and/or discharge full or part cargo alongside other vessel(s) in port or at a safe anchorage **always as per OCIMF rules and regulations.** Concurrent loading or discharging from both side for cargo with flash point over 60 degrees antigrade shall be acceptable by owners, any restriction for such will not count as laytime used.

Charterers are to provide suitable fenders/lines and hoses etc **as per OCIMF rules and regulations** to safely effect such operations and have the option to store same on board for the duration of Charter Party. Handling of such equipment on board the vessel shall be by owners' crew at Owners' cost All such equipment shall be removed from the vessel by Charterers upon completion of Charter Party **loading or discharging** without delay. Vessel's crew shall connect/disconnect cargo hoses, heave down/heave up fenders, take/throw connection lines, transfer to/transfer back cargo hoses and any other activities required for the completion and safe conduct of the ship to ship transfer operation for their account without any exclusion.

Owners warrant that the vessel is equipped with minimum 10 ton derricks crane port and **or** starboard amidships to handle bunker lines/cargo hoses.
All extra insurance for above ship to ship lighterage operations shall be for Owners' account and Charterers have no liability for hull or other damage, if any, that may occur during such operations. Owners warrant that the vessel is equipped and capable of safely carrying out all procedures as set out in the latest revised edition of the ICS/OCIMF Ship to Ship Transfer Guide.

Ship to Ship Transfer may include Charterers very large crude barge (VLCB) of about 34,500 tdw chartered to perform such operations. **Charterers have no liability for hull or other damage, if any, that may occur during such operations due to Masters/Owners fault,**
**LAYTIME AT STS OPERATION – ALL TIME CONSUMED FROM 6 HOURS AFTER VESSEL ARRIVAL AND TENDER NOR AT STS POINT OR VESSEL BEING ALONGSIDE WHICHEVER EARLIER, UNTIL VESSEL CASTS OFF AND COMPLETE UNFENDERING, SHALL COUNT AS USED LAYTIME.**

7) SUPER CARGO:
Charterers have the option to place on board one supercargo at any time during **load or discharge of** this Charter Party. Owner is to provide such supercargo with good suitable **accommodation** with private bath and food at Captain's table at a cost of US$7.00 per day at Charterers' expense. Supercargo will be allowed access, to investigate, ullage and sample all cargo, slop, bunker, and ballast tanks, also any void spaces **at his own risk but always with Master consent,** and access to any other parts of vessel that may relate to carriage of cargo as

P18

he may require. He shall also have the right to require selected valves on bunker and cargo systems to be sealed to preclude the possibility of cargo/product/bunker migration.

8) VESSEL DESCRIPTION:
Questionnaire'88 form duly completed before placing on subjects to form an integral part of this c/p.

9) PROTECTION & INDEMNITY INSURANCE:
Owner warrants that the vessel is a member of the **STEAMSHIPMUTUAL** P&I Club and also a member of the ITOPF and will remain throughout the charter period. Owner warrants that vessel holds a pollution cover of US$ 500 million, and additional US$ 200 million US$ 1 billion during full time of Charter Party. Owners agreed to allow Charterers to have the benefit of Owners' P&I insurance to the extent the Rules of that Association permits. Owners to be responsible for all third party claims which fall under Owner's responsibility.

10) INSURED VALUE:
The vessel insured value is US$ **52.0 million**

11) COMMUNICATIONS:
he master is to allow Charterers supercargo the use of vessels communication equipment **except mobile and satellite phones** for reasonable operation purposes without charge.

Master shall transmit to charterers, on owners account, daily noon positions giving required information regarding vessels position, distance to go, average speed, Eta next port, cargo temperature maintained and any other information requested.

Vessel shall maintain twenty four hours (24 Hrs) watch on VHF Channel 16/14.

12) TRADING HISTORY:
Owners guarantee **to the best of Owners knowledge** that the vessel is not boycotted by the Arab League and has never traded to Israel.

13) AGENCY:
Owners to appoint Charterers recommended agents at load and discharge ports **provided competitive if Malaysian Port to be Owner's agent.**

14) ACCESS:
The Master shall not allow any vessel or craft, other than those of port authorities or pilots, to secure alongside without the express authority of Charterers.

15) OVER AGE INSURANCE:
Any additional insurance payable on vessel and/or cargo due to vessel's age or class shall be for Owners' account.

16) QUANTITATIVE RESPONSIBILITY:
Although Charterers' surveyor may be monitoring any transfer operation, this does not relieve Master or Owners of responsibility for verifying the quantity involved in each oil movement nor for liability under the terms of this charter party for any oil losses.

17) BERTH OCCUPANCY:
Owners warrant vessel shall vacate the berth after completion of ballasting or within one and a half hours following completion of loading/discharging whichever is sooner. If ship not able to vacate berth after such time **as soon as possible** due to reasons attributed **solely** to ship, any extra berth occupancy charges by terminal and port shall be for owners account, all time lost for

such occupancy shall not count as used laytime. However if vessel is waiting for cargo documents then such time and extra costs as above to be for Charterers account.

18) CHARTER SIGNATURE:
Owners acknowledge Charterers' ~~payment procedures~~ require one original signed by Owners or their Agents Charter Party.

19) INTRANSIT LOSS:
~~In addition to other guarantees herein provided with respect to the quality and quantity of vessel's cargo. Owners shall be accountable for product losses, all volumes corrected to 60 degrees Fahrenheit and assessed by an independent cargo inspector, in excess of the following: 0.1 percent for non-volatile products (Fuel Oil and crude Oil), 0.2 percent for gas oil motor oil gasoline, jet fuel and naphtha. If on completion of final discharge an independent cargo inspector selected and hired by the shipper on behalf of Charterers and cargo receiver(s) determines that liquid cargo in excess of 0.1% of the total Bill of Lading quantities loaded onto the vessel remains on board, Charterers shall have the right to deduct from freight an amount equal to the FOB loading port value of the portion of such liquid cargo that exceeds 0.01% of the total Bill of Lading quantities, plus cargo insurance and freight thereon.~~
SL IS TO BE ALLOWED MAX 0.5% OF IN TRANSIT LOSS WHICH SHALL BE THE DIFFERENCE BETWEN THE GROSS QUANTITY MEASURED ONBOARD VSL AFTER LOADING AND GROSS QUANTITY MEASURED ONBOARD PRIOR TO DISCHARGE, LESS ANY OR ALL FREE WATER ONBOARD PRIOR TO LOADING. ANY LOSS EXCEEDING THE SAID 0.5% IS TO BE REIMBURSED BY OWNER TO CHARTERER AT AN AMOUNT EQUOAL TO THE FOB PORT OF LOADING VALUE OF SUCH CARGO PLUS FREIGHT AND INSURANCE DUE WITH RESPECT THERETO.

~~20) CARGO RETENTION:~~

~~If on completion of final discharge an independent cargo inspector selected and hired by the shipper on behalf of Charterer and/or cargo receiver(s) determines that liquid cargo in excess of 0.01% of the total Bill of Lading quantities loaded onto the Vessel remains on board, Charterer shall have the right to deduct from freight an amount equal to the FOB loading port value of the portion of such liquid cargo that exceeds 0.01% of the total Bill of Lading quantities, plus cargo insurance and freight thereon. For the purpose of calculating this deduction, the grade of such excess liquid cargo shall be deemed to be the grade of the final cargo parcel discharged by the vessel.~~

~~21) BLENDING:~~
~~Charterers have the right to load on top of any cargo previously loaded by them, load into a tank containing an on board quantity at bottom, comingle cargo, and blend cargo on board by intertank cargo transfer.~~

22) DEMURRAGE TIME BAR:
Owners agree that Charterers shall be released from all liability for payment of demurrage, unless a ~~telex invoice is received within 30 days upon completion of discharge thereby followed by~~ the claim ~~to be~~ is submitted to Charterers in writing with fully ~~certified~~ original supporting documents, such shall include but not be limited to original signed notice of readiness submitted ~~and accepted~~ and duly signed time sheets and statement of facts duly counter signed if possible by shippers and receivers respectively and ~~original~~ pumping logs duly counter signed by terminal representatives if possible within 90 days of completion of discharge.

23) ADHERENCE TO VOYAGE INSTRUCTIONS:

Owners / master will comply with Charterers voyage instructions **provided in accordance with** this c/p except where safety of life, the vessel or cargo is at risk.

24) YORK/ANTWERP RULES:
York/Antwerp Rules, 1974, as amended ~~1990~~ **1994**, apply to this charter party.

25) AVERAGE/ARBITRATION:
General Average and Arbitration shall take place in London and English Law applies to this charter party.

26) BILLS OF LADING:
In the event of a change in discharge port **and/or consignee** named in Bills of Lading or if the **duly endorsed original** Bills of Lading are not available at discharge port(s), the cargo is to be released by Owners against a Letter of Indemnity signed by an authorized signatory of Charterers in Owners' P&I Club wording without bank guarantee or counter signature.

27) ROB'S:
In the event that any cargo remains on board upon completion of discharge, Charterers shall have the right to ~~deduct from freight~~ claim an amount equal to the FOB port of loading value of such cargo plus freight due with respect thereto **provided the volume of cargo remaining on board is pumpable, liquid and reachable by vessel's fixed pumps as determined by and independent surveyor.**

28) WAR RISKS:
~~Owners shall pay for basic war risks Insurance in respect of the hull and machinery of the vessel and their other interests (including but not limited to, loss of earnings and detention and their protection and indemnity risks), and the basic premiums and/or calls therefore shall be for owners account. War risks insurance for hull and machinery additional premiums if any are for charterers account, net of all discounts or rebates received by owners, and provided always that charterers are given the offers received by owners for such amount of additional premium after receipt of charterers' voyage orders and before placement of policy, charterers may within 48 hours from receipt of owners notice either send its approval of such amount or provide owners with charterers insurance brokers quote (which shall offer placement with BBB or better rated European or American insurers) for such war risk insurance, the amount payable to owners shall be the lower of that presented by owners and that presented by charterers insurance brokers, if charterers do not reply with 48 hours, the amount payable by charterers shall be that stated by the owners. The benefit of discounts or rebates on additional premium received by owners from war risks insurers, underwriters or brokers shall be credited to charterers in full. Charterers shall reimburse owners amounts due under this clause upon receipt of relevant invoices together with reasonable supporting documentation including all associated debit and credit notes (if any). For the avoidance of doubt any 'blocking and trapping', 'loss of profit', 'loss of hire', 'loss of freight' or 'loss of bunkers' insurance take out by owners in respect of the vessel, and any additional premium relating thereto arising from charterers trading of the vessel shall be for owners' account, crew war bonus to be for owners account.~~
**BP WAR RISK INSURANCE CLAUSE (AMENDED) -**

OWNERS SHALL EFFECT WAR RISKS INSURANCE IN RESPECT OF THE HULL AND MACHINERY OF THE VESSEL AND THEIR OTHER INTERESTS (INCL BUT NOT LIMITED TO, LOSS OF EARNINGS AND DETENTION AND THEIR PROTECTION AND INDEMNITY RISKS), AND THE BASIC PREMIUMS AND/OR CALLS THEREFORE SHALL BE FOR OWNERS ACCOUNT. WAR RISKS INSURANCE= ADDITIONAL PREMIUMS IF ANY ARE FOR CHARTERERS ACCOUNT, NET OF ALL DISCOUNTS OR REBATES RECEIVED BY OWNERS, AND PROVIDED ALWAYS THAT CHARTERERS ARE GIVEN AN INDICATION OF THE EXPECTED AMOUNT OF ADDITIONAL PREMIUM AS SOON AS POSSIBLE AFTER RECEIPT OF CHARTERERS VOYAGE ORDERS.

P21

THE BENEFIT OF DISCOUNTS OR REBATES ON ADDITIONAL PREMIUM RECEIVED BY
OWNERS FROM THEIR WAR RISKS INSURERS, UNDERWRITERS OR BROKERS SHALL BE
CREDITED TO CHARTERERS IN FULL. CHARTERERS SHALL REIMBURSE OWNERS ANY
AMOUNTS DUE UNDER THIS CLAUSE UPON RECEIPT OF OWNERS' INVOICE TOGETHER
WITH REASONABLE SUPPORTING  DOCUMENTATION INCLUDING ALL ASSOCIATED
DEBIT AND CREDIT NOTES (IF ANY).=

FOR THE AVOIDANCE OF DOUBT ANY 'BLOCKING AND TRAPPING', 'LOSS OF
PROFIT','LOSS OF HIRE"LOSS OF FREIGHT' OR 'LOSS OF BUNKERS' INSURANCE
TAKE OUT BY OWNERS IN RESPECT OF THE VESSEL, AND ANY ADDITIONAL
PREMIUM RELATING THERETO ARISING FROM CHARTERERS TRADING OF THE
VESSEL SHALL BE FOR OWNERS' ACCOUNT.CREW  WAR BONUS TO BE FOR OWNERS
ACCOUNT.

29) ITOPF:
Owners/Operators to be a member of ITOPF and shall present C.L.C. Certificate covering the
ntire Charter Party period.
his is required before payment is made by Charterers.

30) PRORATION:
Laytime and waiting time if any at load/discharge ports to be prorated amongst
charterers/receivers according to respective cargo quantity.

31) Naming Load and Discharge ports

Clause 4 of Asbatankvoy c/p to be replaced with this clause. Notwithstanding  anything  to  the
contrary in this  charter party  and  notwithstanding what  loading and/or  discharging ports/ranges
may have  been  nominated  and  bills  of lading  issued , charterer  shall  have  the right  to
change its nomination  of the  loading and/or discharging ports/ranges.

Any  extra time  and  expense incurred  by  owner in complying  with  charterer's orders  shall be
for  charterer's  account.

Freight is based on the voyage actually performed.  Charterer shall have  the right to make  as
many  changes as it deems necessary.

32) POSITION AND BALLAST SPEED:
Owners warrants that the vessel's position at the time of fixture is ..........and vessel's ballast speed
will be ...... knots with an expected Eta basis .......  as ......

33) SPEED:
Vessel will perform  the laden  voyage at ...... knots upto  ws 5, weather and safe navigation
permitting
**Vessel will perform laden passage at about 13.5 knots WSNP.**

34) BALLASTING/SHIFTING:
Deballasting **unless concurrent with cargo operations** and time proceeding to **first** berth shall
not count as used laytime or time on demurrage, even if vessel on demurrage.

35) DOCUMENTATION:
Owners warrant and undertake that all loading documents shall be strictly private and confidential
and shall not be handed over to any party other than charterer or charterers agent/representative

or port authorities, only if instructed by charterers. Such confidentiality shall include copies and/or quotes of such documents to any party other than charterers.

Owners undertake to instruct master to strictly adhere to above and not to release any information under whatsoever circumstances neither in writing or in verbal unless agreed/instructed in writing by the charterers.

36) Charterers' shall have the right to ask owners to reissue new Bill of Lading, as per requirements of charterers, upon delivery of the signed B/L's to the owner/owners agent or master. Owners shall comply with such request.

37) In case the vessel calling port Sudan master of vessel should obtain signature and stamp of receivers and agents/all concerned on following documents prior sailing from port Sudan, NOR, ullage report before discharge, ship ullage report after discharge, dry tank certificate, time sheet and LOP if any.

38) Owners warrant that, a Safety Management System (SMS) in accordance with the ISM code is in operation both on shore and on board the vessels. Onwers further warrant that during the entire 'uration of c/p, owner (or the company as defined by the ISM code) shall have a vaild document of ompliance and the vessels shall have a safety management certificate, copies of which will be supplied to charterers **on their request.**

39) This charter party shall be treated as an independent contract and neither party shall have the right of off-setting and/or claim any amounts due or not due from any other charter parties or dealings of whatsoever nature, whether or not same may be due or justified.

The owner warrants that the master and vessel will fully comply with c/p and will not lien cargo or delay or suspend operations due to any claim arising out of **previous** c/p's/contracts      between owner and charterers and/or any charterers affiliates and/or any of charterers subsidiary companies.

40) DISCHARGE / RELOAD CLAUSE:
Charterers may order the vessel to discharge and/or back-load a part or full cargo at any nominated port within the loading/discharging ranges specified within part-1 and within the rotation 'f the ports previously nominated, provided that any cargo loaded is of the description specified in )art-1 and the Master in his reasonable discretion determines that the cargo can be loaded, segregated and discharged without risk of contamination by, or of any other cargo. Charterers shall pay in respect of loading, carrying and discharging such cargo as follows:

   a) All time used including deviation if any to be for charterers account. Deviation and other port and anchorage time used at demurrage rate plus all bunkers FO and MDO consumed irrespective of vessel being idle or steaming, plus port cost.
   b) Any additional expenses, including port charges and all bunkers FO and MDO consumed, incurred.
   c) If the vessel is fixed on a world-scale rate in part-1 then freight shall always be paid for the whole voyage at the rate(s) specified in part-1 on the largest cargo quantity carried on any ocean leg.

41) Bunker Supply:
In the event of the vessel has to be bunkered during the currency of the Charterparty, Owners to stem bunkers from Charterers nominated suppliers.

42) Fuel Oil Clause:

Owners hereby represent and warrant that the vessel is and will at all times comply with and be permitted to trade under the provisions of the MARPOL Regulation, including but not limited to 13H,13G, and 13F of the relevant annex already into force, or coming into force on 5 April 2005, as well maintain compliance with any other laws or regulations implementing the above regulations or similar laws or regulations imposed by the vessel's flag state or any Governmental authority at the port(s) of loading and discharge so that the vessel is permitted throughout the currency of this charter and related voyages to carry a cargo of heavy fuel oil ("HGO") as defined in MARPOL as the following: (a) Crude oils having a density of 15ºC higher than 900 kg/m3; and (b) Fuel oils having either a density of 15ºC higher than 900 kg/m3 or a kinematic viscosity at 50ºC higher than 180 mm2/s.

Owners furthermore warrant that they shall also comply with and maintain the vessel throughout the currency of this charter in compliance with all classification society regulations for the carriage of heavy fuel oil.

Owners undertake to indemnify and hold charterers free and harmless from any and all claims, costs, expenses, losses, and consequences of whatsoever nature, which charterers may incur as a result, either directly or indirectly, of the vessel's non-compliance with the applicable MARPOL regulations, and/or flag state and/or Governmental laws and regulations or other conditions garding the carriage of heavy fuel oil.

43) CURRENCY CLAUSE
The Purchase Price shall be paid to such account at such bank as the Seller may from time to time direct to the Buyer in the Nominated Currency and in such funds in the Nominated Currency as are customary at the time for settlement of transactions in the relevant currency in the place of payment. Payment shall be deemed to have been received by the Seller on the date on which the bank directed by the Seller to receive the Nominated Currency receives authenticated advice of receipt, unless that advice is received by such bank on a day other than a Banking Day or at a time of day (whether on a Banking Day or not) when it is impossible or impracticable for the Seller to utilise the amount received for value that same day, in which event payment shall be deemed to have been received by the Seller on the Banking Day next following the date of receipt of advice by the said bank. The Nominated Currency shall mean United States Dollars unless the Buyer shall elect to make payment in Euros by notice to the Seller given not more than one (1) Banking Day after receipt of the [ten (10)] day notice period referred to in Clause 5(a) above.

In the event of the Seller receiving the Purchase Price in Euros and if the amount received is insufficient when converted into United States Dollars at the date of receipt to satisfy in full the amount of the Purchase Price in United States Dollars, the Buyer shall, on the Seller's written demand, pay to the Seller such further amount in Euros as is sufficient to satisfy in full the payment of the Purchase Price in United States Dollars and the Seller shall have a lien over the Vessel for such amount unpaid.

EXHIBIT 3

IN THE MATTER OF THE ARBITRATION ACT 1996

AND IN THE MATTER OF AN ARBITRATION

BETWEEN:


HANJIN SHIPPING CO LTD

Claimants

(Owners)

- and -


INTERNATIONAL OVERSEAS INC

Respondents

(Charterers)

"SUN ROSE "

Charterparty dated 4th December 2008

_____

FINAL ARBITRATION AWARD

_____

We hereby certify that this is a true copy
of the Original Document

MFB

**Whereas:**


1.   By a Charterparty evidenced by a fixture recap based on an amended Asbatankvoy
form of charter with additional clauses dated 4th December 2008, the Claimants
(hereinafter referred to "the Owners " although they were in fact Disponent Owners)
chartered their vessel the, "SUN ROSE", to the Respondents (hereinafter referred to
as "the Charterers") for a voyage from, in the event, Fujairah to Singapore with a
cargo of fuel oil.


2.   The fixture recap and Clause 24 of Part II of the charter provide for disputes to be
referred to arbitration in London and for English law to apply.  The seat of the
arbitration is England.

3. Disputes as more detailed hereinafter having arisen, the Owners appointed me, the undersigned John Schofield of 10 Sutherland Avenue, Petts Wood, Orpington, Kent BR5 1QZ AS Arbitrator and the Charterers appointed me, the undersigned Patrick O'Donovan of Churcham House, 1 Bridgeman. Road, Teddington, Middlesex TW11 9AJ as Arbitrator. We finding ourselves in agreement had no need to appoint a third arbitrator as provided for in the arbitration clause of the charter, both sides having agreed that the party appointed arbitrators should proceed to an award.

4. In this reference, the Owners claim demurrage in the sum of USD 268,835.93 plus interest and costs. The Charterers concede demurrage in the sum of USD 24,253.15 but no more.

5. Written submissions and supporting documents were presented by London Solicitors acting for the Owners and by the Charterers' Defence Club. Neither side sought an oral hearing.

**NOW WE,** the said JOHN SCHOFIELD and PATRICK O'DONOVAN having considered the written submissions and supporting documents put before us, having conferred with each other and finding ourselves in agreement **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **FINAL ARBITRATION AWARD** as follows for the Reasons set out in the accompanying document, which is integral to and forms part of our Award:

A. We find that the Owners' claim for demurrage in the sum of USD 268,835.93 succeeds in full.

B. WE THEREFORE AWARD AND ADJUDGE that the Charterers shall forthwith pay to the Owners the sum of USD 268,835.93, together with compound interest thereon with three monthly rests, at an annual rate of 4% from 1st March 2009 until the date of payment.

C. WE FURTHER AWARD AND ADJUDGE that the Charterers shall bear their own costs in the Reference, together with those of the Owners, the latter if not agreed to be determined by us, we reserving our jurisdiction as necessary, together with compound interest thereon with three monthly rests at an annual rate of 4% from the date of our award. The Charterers shall also pay for the cost of our Award in the sum of £4,750.00, PROVIDED ALWAYS that if the Owners shall have paid for this in the first instance, they shall be entitled to an immediate reimbursement of the monies so paid, together with compound interest thereon with three monthly rests at an annual rate of 4% from the date of payment until the date of reimbursement.

Given under our hands,  this 8th    day of ~~September~~ 2010.


_____                    _____
John Schofield                                      Witness


_____                    _____
Patrick O'Donovan                                   Witness

IN THE MATTER OF THE ARBITRATION ACT 1996

AND IN THE MATTER OF AN ARBITRATION

BETWEEN:


HANJIN SHIPPING CO LTD

Claimants

(Owners)


- and -


INTERNATIONAL OVERSEAS INC

Respondents

(Charterers)


"SUN ROSE "

Charterparty dated 4th December 2008

---

REASONS FOR THE FINAL ARBITRATION AWARD

---

These Reasons are integral to and form part of the Award to which they relate


1. By a Charterparty evidenced by a fixture recap dated 4th December 2008 based on an amended Asbatankvoy form of charter with additional clauses, the Claimants ("the Owners" although in fact they were Disponent Owners) chartered their vessel, the "SUN ROSE" to the Respondents ("the Charterers") for a voyage from, in the event, Fujairah to Singapore with a cargo of fuel oil.

2.  The fixture recap had a laycan of 27th-29th December 2008 (that is a total of 3 days) but it had to be narrowed to 2 days in the Charterers' option by 20th December 2008. Although we have not been told explicitly, it appears that the Charterers narrowed the laycan to 28th – 29th December 2008. The "SUN ROSE" arrived at Fujairah on 22nd December 2008 and shifted to the anchorage at which the cargo was to be loaded on 27th December 2008, anchoring at 1200 local time. Notice of Readiness was tendered at 0001 on 28th December 2008, the opening of the narrowed laycan spread.

3.  The "SUN ROSE" was due to load by STS transfer from a vessel called the "AL MUHKTARAH". What the Charterers say about this in their Defence submissions is the following:

"The Al Muhktarah" suffered delays with cargo operations in the Red Sea. The vessel was to have loaded cargo of fuel oil at Yanbu, Saudi Arabia on 16 December 2008 which was then to be loaded on to the "Sun Rose" at Fujairah. The "Al Muhktarah" was to reach Fujairah latest 25 December 2008. This would mean the "Al Muhktarah" would meet the "Sun Rose"'s laycan of 28 December 2008. However the loading at Yanbu actually took place on 26 December 2008" which meant she was late arriving at the STS point by approximately 10 days."

4.  In fact, the "AL MUHKTARAH" arrived at Fujairah on 5th January 2009 and the "SUN ROSE" berthed alongside her at 1442 local time on the same day. Hoses were connected at 1642 and loading began ay 1712. It was completed at 0224 on 7th January 2009 and hoses were disconnected at 0342. Unmooring from the mother vessel was completed at 0942 and thereafter the "SUN ROSE" sailed for Singapore, the discharge port.

5.  The Owners say that laytime ran, as per Clause 6 of Part II of the Charterparty from 0601 on 28th December 2008 until it expired and that the vessel was on demurrage thereafter until hoses were disconnected at 0342 on 7th January 2009. They also refer, particularly in their Reply submissions to additional Clause 6 which in relation to STS Transfer Operations refers to laytime commencing 6 hours after the vessel's arrival at the STS Point or being alongside, whichever occurs earlier. We are satisfied that the reference to "The vessel" is a reference to the loading vessel not the mother vessel who supplies the cargo. They say a total of 10 days 3 hours 41 minutes laytime/time on demurrage was used at the load port.

6. The Charterers say that time did not begin until 1442 on 5th January 2009 when the "SUN ROSE" berthed alongside the mother vessel and ran thereafter until she completed unmooring 0942 on 7th January 2009. Additional Clause 6 relating to STS Transfer operations does indeed provide, as the Charterers contend, that laytime should continue until the daughter vessel casts off, rather than when hoses were disconnected which is the basis of the Owners' calculation. However by that time laytime had expired and the vessel was on demurrage and strictly speaking additional Clause 6 does not cover demurrage. Although the Owners accept what the Charterers say in their Reply submissions, they maintain their original calculation based on the disconnection of hoses, which we think they are right to do.

7. This was clearly a port charter and the Charterers do not explain why they say that time did not begin to count against them until berthing alongside the mother vessel was completed. They do not point to additional Clause 6 or any other provision in the charter which might override the provisions of Clause 6 of Part II or additional Clause 6 relating to the commencement of laytime. All they say is that the delays "were beyond their control".

8. That may be so, but it is no reason why the Owners should bear the consequences of the delays. We therefore find that the Owners have correctly calculated the time used at the load port.

9. The "SUN ROSE" arrived at Singapore at 1918 on 18th January 2009, berthing at 2342 on the same day. Discharge was completed at at 1236 on 21st January 2009. The parties are agreed that a total 2 days 12 hours 54 minutes was used at the discharge port.


*The demurrage due to the Owners*


10. The time used by the Charterers in loading and discharging the vessel was therefore as follows:

| | | |
|---|---|---|
| Time used at Fujairah | 10 days 3 hours 41 minutes - | paragraphs 5 and 8 |
| Time used at Singapore | 2 days 12 hours 54 minutes - | paragraph 9 |
| Total | 12 days 16 hours 35 minutes | |

| | |
|---|---|
| Laytime allowed | 3 days 12 hours 00 minutes |
| Time on demurrage | 9 days 4 hours 35 minutes |
| @ USD 30,000 per day = USD 275,729.16 | |
| less address commission  USD      6,893.23 | |
| Amount due             USD    268, 835.93. | |

93. We therefore award the Owners the sum of USD 268,835.93.

*Interest and costs*

94, In the exercise of our discretion, we award interest to the Owners from 1st March 2009. As the successful party, the Owners are also entitled to their costs.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
HANJIN SHIPPING CO LTD.,

                              Petitioner,              10 CIV

-v-

                                         **VERIFICATION OF
PETITION**

INTERNATIONAL OIL OVERSEAS INC.,

                               Respondent.
------------------------------------------------------------x

        Pursuant to 28 U.S.C. §1746, KERRI M. D'AMBROSIO, Esq., declares under the penalty of perjury:

        1.     I am an attorney with the law firm of CHALOS & CO, P.C., counsel for the Petitioner,

HANJIN SHIPPING CO LTD., herein;

        2.     I have read the foregoing Petition and know the contents thereof; and

        3.     I believe the matters to be true based on documents and information obtained from

employees and representatives of the Petitioner through its agents, underwriters and attorneys.

        4.     The reason that this verification was made by deponent and not by the Petitioner is

because Petitioner is a foreign corporation, whose officers are not in this district, and whose verification

cannot be obtained within the time constraints presented by the circumstances of this case.

        I declare under penalty of perjury that the foregoing is true and correct.

Dated:  Oyster Bay, New York
        November 17, 2010

                                 CHALOS & CO, P.C.
                                 Attorneys for Petitioner
                                 HANJIN SHIPPING CO LTD.

                    By:    *Kerri M. D'Ambrosio*
                               Kerri M. D'Ambrosio (KD-0249)
                               123 South Street
                               Oyster Bay, New York 11771
                               Tel: (516) 714-4300
                               Fax: (516) 750-9051
                               Email: kdambrosio@chaloslaw.com